# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN

| | | |
|---|---|---|
| LISA WHITE, | ) | Case No.: |
| on behalf of herself and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | **DEMAND FOR JURY TRIAL** |
| FCA US LLC, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## CLASS ACTION COMPLAINT

Plaintiff Lisa White brings this action against Defendant FCA US, LLC ("FCA"), by and through their attorneys, individually and on behalf of all others similarly situated, and allege as follows:

## I   <u>INTRODUCTION</u>

1.     This is a class action lawsuit brought by Plaintiff on behalf of herself and a class of current and former owners and lessees of certain Chrysler and Dodge-brand vehicles (the "Class Vehicles")[1] sold with defective door-latching systems. This action arises from Defendant's failure, despite its longstanding knowledge of a material design and manufacturing defect, to disclose to Plaintiff and other consumers that the Class Vehicles have latch systems that fail on the doors, causing the door to either refuse to lock or to prevent the door from opening after it is locked (the "Door Latch Defect").

2.     This defect—which appears to arise from defective actuators preventing the locks from functioning—causes the Class Vehicles' door sensors to fail. Once these sensors cease operating properly, the Class Vehicles' door latching mechanism(s) and door locking system(s) fail to function as intended and expected.

---

[1] The Class Vehicles include all model year 2013-2020 model year Dodge Grand Caravan and model year 2013-2016 Chrysler Town & Country vehicles. Plaintiff reserves the right to amend or add to the vehicle models and model years included in the definition of Class Vehicles.

As a result, the door latch assemblies must be replaced, resulting in costly repairs to consumers that also fail to remedy the root cause of the Door Latch Defect.

3. All of the Class Vehicles were manufactured with same sliding door latches—Part Numbers 68030378 (right door) and 68030379 (left door)—and sliding door actuators—Part Numbers 5020678 (right door) and 5020679 (left door).

4. Significantly, when the Door Latch Defect occurs it poses a safety risk to the operator and passengers of the vehicle because the door latching system fails to operate correctly. In some instances, single or multiple doors on the Class Vehicles may not lock at any time, whether the vehicle is turned on or off, despite the necessary commands being made by the operator. In other circumstances, the door may be locked and not open, requiring passengers to evacuate by means of other doors, or even windows. This jeopardizes the safety of the Class Vehicles' occupants by making them more vulnerable to potential crime, including theft, unintentional door openings during operation, not being able to quickly egress from the vehicle in the event of an accident, and other risks that could have otherwise been avoided. The Door Latch Defect poses a particular risk to young children because it can result in a vehicle's doors opening while it is in motion. Furthermore, if this condition continues when the vehicle is turned off, it can drain the vehicle's battery and leave the vehicle's operator and passengers stranded.

5.     Not only did FCA actively conceal the fact that particular components within the door latch system do not function properly, FCA also failed to advise Class members that the components within the door latch system—particularly the sliding door lock actuator at the source of the problem—are defective (and require costly repairs to fix), and that the existence of the Door Latch Defect diminishes the intrinsic and resale value of the Class Vehicles, leading to the safety concerns described herein.

6.     FCA has long been aware of the Door Latch Defect. Yet notwithstanding its longstanding knowledge, FCA routinely has refused to repair the Class Vehicles without charge after the defect manifests.

7.     Many other owners and lessees of Class Vehicles have communicated with FCA and its agents to request that they remedy and/or address the Door Latch Defect and/or resultant damage at no expense. Defendant has failed and/or refused to do so.

8.     FCA has taken no action to correct the root cause of the Door Latch Defect, whether its effects manifest either in or outside of the relevant warranty period. Because the Door Latch Defect typically manifests within and shortly outside of the warranty period for the Class Vehicles—and given Defendant's knowledge of this concealed, safety-related design defect—FCA's attempt to limit the applicable warranties with respect to the Door Latch Defect is unconscionable.

9. Despite notice and knowledge of the Door Latch Defect from the numerous consumer complaints it has received, information received from dealers, pre-sale durability testing, National Highway Traffic Safety Administration ("NHTSA") complaints, and its own internal records, including similar door latch part failures in prior model year vehicles, FCU has not recalled the Class Vehicles to repair the Door Latch Defect, offered its customers a suitable repair or replacement free of charge, or offered to reimburse consumers who have incurred out-of-pocket expenses to repair the Door Latch Defect.

10. As a result of FCA's unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices FCA committed were conducted in a manner giving rise to substantial aggravating circumstances.

11. Had Plaintiff and other Class members known about the Door Latch Defect at the time of purchase or lease, they would not have purchased or leased the Class Vehicle or would have paid substantially less for them.

12. As a result of the Door Latch Defect and the monetary costs associated with attempting to repair it, Plaintiff and other Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by FCA's conduct.

13. Accordingly, Plaintiff brings this action to redress FCA's violations of the Magnusson-Moss Warranty Act and Maine's consumer fraud statutes.

## II JURISDICTION AND VENUE

14. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) and (d) because the amount in controversy for the Class exceeds $5,000,000 and Plaintiff is a citizen of a different state than FCA.

15. This Court has personal jurisdiction over Plaintiff because she submits to the Court's personal jurisdiction. This Court has personal jurisdiction over FCA because FCA conducted and continues to conduct substantial business in this District; its corporate headquarters is located in this District; and because it has committed the acts and omissions complained of herein in this District, including the marketing, selling, and leasing of Class Vehicles in this District.

16. Venue as to FCA is proper in this judicial district under 28 U.S.C § 1391 because Defendant sells a substantial number of automobiles in this District, has dealerships in this District, maintains its corporate headquarters within this District, and many of FCA's acts complained of herein occurred within this District, including the marketing and leasing of the Class Vehicles to Plaintiff and members of the putative Class in this District.

## III  PARTIES

**A.    Plaintiff White**

17.    White is a citizen of Maine, residing in Wells, Maine.

18.    On or around September 15, 2018, Plaintiff purchased a new model year 2018 Dodge Grand Caravan from Marc Motors Chrysler Dodge Jeep Ram, an authorized FCA dealer and repair center located in Sanford, Maine.

19.    White purchased (and still owns) this vehicle, which is used for personal, family, and/or household uses. Her vehicle bears Vehicle Identification Number: 2C4RDGBG7JR216823.

20.    On or before March 12, 2021, White recognized that the rear passenger side door on her vehicle had stopped locking. She presented the vehicle to Marc Motors Chrysler Dodge Jeep Ram on March 12, 2021, with the vehicle having 53,429 miles on its odometer. The technician verified the problem but charged White $630.80 for the parts and labor necessary to repair the vehicle.

21.    White has suffered an ascertainable loss as a result of FCA's omissions associated with the Door Latch Defect, including, but not limited to, her out-of-pocket loss associated with having to repair the Door Latch Defect and future attempted repairs and diminished value of her vehicle.

22.     Neither FCA, nor any of its agents, dealers or other representatives informed White of the existence of the Door Latch Defect prior to either her purchase of the vehicle, or when she took the vehicle in for repair.

**B.      Defendant FCA**

23.     Defendant FCA is a Michigan limited liability company, with its principal office located in Auburn Hills, Michigan. FCA designs, tests, manufactures, distributes, warrants, sells, and leases various vehicles under several prominent brand names, including Chrysler, Jeep, and Dodge in this District and throughout the United States. FCA manufactured the Class Vehicles at issue in this case.

## IV      FACTUAL ALLEGATIONS

**A.      The Door Latch Defect**

24.     The Dodge Caravan (and long-wheelbase Dodge Grand Caravan) was a minivan manufactured by FCA and sold across the United States. The Dodge Grand Caravan was first made available in as a 1984 model-year vehicle. As of 2020, FCA had discontinued the Dodge Grand Caravan model and replaced it with a similar model, the Chrysler Voyager.

25.     From 2013-2020, the Dodge Grand Caravan used the same design, manufacturing, and parts, including those parts involved in the Door Latch Defect.

26.     The Chrysler Town & Country was also a minivan manufactured and marketed beginning in 1990. From 2013-2016, the Chrysler Town & Country used the same design, manufacturing, and parts, including those parts involved in the Door Latch Defect.

27.     Power door latches (also known as electronic door locks or central locking) allow the driver or front passenger to simultaneously lock or unlock all of the passenger doors of an automobile or truck, through use of an interior lock/unlock button or switch, an exterior manual locking mechanism, and/or a wireless key fob. Additionally, many modern vehicles are pre-programmed to utilize the electronic door latching system to engage safety features such as locking the doors when a vehicle reaches a certain speed and unlocking the doors if the vehicle is turned off or determined to have been in an accident.

28.     The components of the power door latching system in the Class Vehicles include, inter alia, a door latch assembly, electronic switches, a central communication brain, metal rods, and cables. In the Class Vehicles, the door latch assemblies will mechanically lock and unlock the door latches, thereby allowing the doors to be open or closed, based upon the electrical signals that are sent to it. The pictures below illustrate the interior door components comprising the door latching system in the Class Vehicles. Specifically, figure number "22" identifies the parts at issue.





29.     A door actuator is an electric motor that controls the locking and unlocking of vehicle doors. When a button is pressed on the key fob (or in the vehicle), a signal to lock or unlock the door is sent to the Body Control Module (BCM) which, in turn, communicates with the sliding door actuator. In some of the Class Vehicles, the lock actuator is mounted between the lock cylinder and the lock and latch assembly. The actuator is essentially attached to the lock linkage (a cable or rod) inside the door and responds to the signal from the BCM to move the linkage back and forth, to lock and unlock. Many new Dodge vehicles have the actuator built

into the door latch assembly. The picture below illustrates the inside of a generic door actuator.



30.     In the Class Vehicles, the sliding door fails to lock or unlock with the electronic controls, and often will not open—even manually. Failure to lock or unlock the sliding door with electronic controls or even manually is an indicator that the actuator is not functioning properly. Normally, a slight clunking sound or whirring sound can be heard when the locks are activated. If the sound of the actuator becomes weak or excessively noisy, it is a sign that the actuator may be failing. In

some cases, the lock may move partially, but not all the way. The picture below illustrates an actuator contained in the Class Vehicles.



31.     Furthermore, a failing lock actuator can be a symptom of a larger issue with the central locking system, including problems with the BCM or multiple actuators. A fault with the sliding door actuator can cause problems with all the actuators and present a safety hazard, as with the Class Vehicles.

32.     In the Class Vehicles, the opening and closing of the electrical circuit by the door sensor sends electrical signals to other components of the vehicle, including the Body Control Module ("BCM"), to communicate that the passenger doors on the vehicle are either opened or closed. If a door sensor communicates that one of the passenger doors is not adequately closed then the vehicle's interior dome light will continuously illuminate, the door chime will sound, the alarm system will not function properly, and the "door ajar" indicator light, located in the instrument cluster, will illuminate. Additionally, the vehicle doors will not lock, neither while the vehicle is parked nor while being driven. Furthermore, if this condition continues when the vehicle is turned off, it can completely drain the vehicle's battery and leave the vehicle operator and passengers stranded.

33.     The picture below illustrates that the door latch assembly (including door sensor) communicates only with the BCM. The BCM is a major module that handles multiple tasks including, *inter alia*, lighting, climate control, keyless entry, anti-theft duties, and managing communications between other modules. The BCM then uses this erroneous message from the door sensor (when a faulty door ajar situation is created) and causes other inappropriate and unsafe functions to be carried out within the vehicle while in motion, i.e. the interior dome light will continuously illuminate, the door chime will continuously sound, and the "door ajar" indicator light, located in the instrument cluster, will illuminate.

//

//

//



34.    Power door latch systems are designed to function for periods (and mileages) substantially in excess of those specified in Defendant's warranties, and given past experience, consumers legitimately expect to enjoy the use of an automobile without worry that the door latch systems will fail for significantly longer than the limited times and mileages identified in Defendant's warranties.

35.    Automobiles must incorporate designs that are able to withstand foreseeable usage conditions such as opening and closing doors, as well as, locking and unlocking the doors electronically. A vehicle can suffer extensive damage and costly repairs from customary environmental and usage conditions when the vehicle contains a defect.

36.    The Class Vehicles were manufactured with insufficient and defective door latch systems, which defects arise from defective lock actuators. These defects render the Class Vehicles prone to door failure. Once the door locks cease operating properly, the door latch assemblies and door latching system fail to function as intended and expected and can result in further problems with the BCM. As a result, the door latch assemblies, including the actuators, must be replaced. As explained above, the Door Latch Defect poses serious safety and security issues for operators and occupants of the Class Vehicles.

37.    In many instances, consumers have incurred and will continue to incur expenses for the continued repair and/or replacement of the defective door latch

assemblies despite such defect having been contained in the Class Vehicles when manufactured by Defendant.

38.    Upon information and belief, FCA, through (1) its own records of customers' complaints, (2) dealership repair records, (3) records from and to the National Highway Traffic Safety Administration (NHTSA), (4) warranty and post-warranty claims, (5) door latch and door sensor failure in prior model years, (6) pre-sale durability testing, and (7) other various sources, was aware of the Door Latch Defect but failed to notify customers about it, or provide any adequate remedy for it.

39.    FCA failed to adequately research, design, test, and/or manufacture the electronic door latch system before warranting, advertising, promoting, marketing, and selling the Class Vehicles as suitable and safe for use in an intended and/or reasonably foreseeable manner.

40.    Buyers, lessees, and other owners of the affected vehicles were without access to the information concealed by FCA as described herein, and therefore reasonably relied on FCA's representations and warranties regarding the quality, durability, and other material characteristics of their vehicles. Had these buyers and lessees known of the defect and the potential danger, they would have taken steps to avoid that danger and/or would have paid less for their vehicles than the amounts they actually paid or would not have purchased the vehicles. FCA is aware that many

Class Vehicle owners experienced door sensor failure and door latch assembly replacement. Regardless, it has refused to correct the defect. Instead, FCA seeks to burden Class members with its failure while also reaping the benefit of profits from costly repairs paid for by Class members.

41.     FCA is, and has been, aware that the Door Latch Defect in the Class Vehicles exists. The rear sliding doors on each Class Vehicle each contain the same door latch design and door sensor switch.

42.     According to FCA, the Door Latch Defect manifests when either "one or both of the sliding door locks do not function and/or emit a loud buzzing noise during lock/unlock operation." But FCA will only provide repairs for Class Vehicles that fall under the general warranty period. FCA charges Class members for attempted repairs and parts to correct the Door Latch Defect.

43.     FCA has long-standing and material knowledge of the Door Latch Defect. FCA routinely monitors the internet for complaints similar in substance to those quoted below. Its customer relations department routinely monitors the internet for customer complaints, and it retains the services of third parties to do the same.  Further, FCA's customer relations division regularly receives and responds to customer calls concerning, *inter alia*, product defects.  Through these sources, FCA knew about the Door Latch Defect. The NHTSA complaints also indicate

FCA's knowledge of the defect and the danger it poses to passengers and the general public.

44.   Moreover, FCA should have known about the Door Latch Defect because its customer relations department, which interacts with FCA-authorized service technicians in order to identify potentially widespread vehicle problems and assist in diagnosing vehicle issues, has received numerous reports that the Door Latch Defect causes a sudden loss of braking power. FCA's customer relations department also collects and analyzes field data including, but not limited to, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

45.   FCA's warranty department similarly reviews and analyzes warranty data submitted by its dealerships and authorized technicians in order to identify defect trends in its vehicles. FCA dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide FCA with detailed documentation. FCA also requires service centers to save the broken parts in case FCA audits the dealership, or otherwise acts to verify the warranty repair. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs because FCA withholds payment for the repair if the complaint, cause, and correction are not sufficiently described.

46.     FCA's knowledge can also be inferred because several NHTSA complaints reference that FCA was notified of consumers' concerns regarding the Class Vehicles' transmissions.

47.     FCA's acts and omissions have unnecessarily put the safety of Class Members and the public in jeopardy.  The Door Latch Defect causes a safety event that can directly injure passengers, or create fear and surprise.

48.     Further, because of FCA's unfair, deceptive, and/or fraudulent business practices, owners, and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. FCA undertook these unfair and deceptive trade practices in a manner giving rise to substantial aggravating circumstances.

49.     Had FCA known of the Door Latch Defect at the time of purchase or lease, she would not have bought or leased the Vehicle, or she would have paid substantially less for the Vehicle.

50.     As a result of the Door Latch Defect and the monetary costs associated with attempting to repair it, FCA and the other Class members have suffered injury in fact, incurred damages, and have otherwise been harmed by FCA's conduct. Accordingly, Plaintiff brings this action to redress FCA's violations of various consumer protection statutes, and also seek recovery for FCA's breach of express

warranty, breach of implied warranty, breach of the duty of good faith and fair dealing, and fraudulent concealment.

**B.    FCA's Knowledge of the Defect, as Evidenced by Its Technical Service Bulletins**

**1.    August 10, 2016 Technical Service Bulletin 10177524**

51.    On August 10, 2016. FCA first acknowledged issues with the sliding door latch, model numbers 68030378A$ (left door) and 68030379A$ (right door), and Sliding Door Actuator Module on its 2016 and 2017 Dodge Grand Caravan and Chrysler Town & County. This secret communication from FCA to its dealers that when dealers received reports of an intermittent issue or complaint that the sliding door does not power open or close, they should first inspect the Sliding Door Actuator Module and latch for fretting and oxidation corrosion at connections, prior to replacing any parts. Dealers were instructed that "If concerns are found with the Module, then replace the Sliding Door Actuator Module. Otherwise replace the Sliding Door Latch."

52.    FCA instructed its dealers contact for feedback related to this service bulletin.

53.    FCA did not instruct its dealers to perform the necessary repairs at FCA's expense nor did it provide for any additional time under the new vehicle limited warranty to have the problem addressed at no cost to the vehicle owner.

**2.     June 4, 2020 Technical Service Bulletin 23-017-250**

54.     Nearly four years later, on June 4, 2020, FCA issued a second Technical Service Bulletin, number 23-017-20, in an attempt to quietly address continuing issues with non-functioning locks on the vehicles' sliding doors that were still being reported with the sliding doors on the Chrysler Town & County and Dodge Grand Caravan.

55.     This technical service bulletin called for the replacement of the sliding door lock actuator, part number 05020678AC (right door) and 0502679AC (left door), on its model year 2016 and 2017 Dodge Grand Caravan and Chrysler Town & County.

56.     The technical service bulleting was limited to vehicles built from November 1, 2015, to June 30, 2017, and FCA did not instruct its dealers to perform the necessary repairs at FCA's expense, nor did it provide for any additional time under the new vehicle limited warranty to have the problem addressed at no cost to the vehicle owner.

**C.     Investigation by NHTSA**

57.     In July 2021, NHTSA opened a Defects Investigation (PE 21-016) after receiving 476 consumer complaints alleging one or both of the sliding doors on the 2016 Dodge Grand Caravan and Chrysler Town & Country. The complaints describe consumers having to remove passengers in the rear of the vehicle through the front

doors, the operable side door (if applicable), and even through windows in certain cases. NHTSA expressed the concern of the complainants that "in the event of an emergency or crash, if the sliding door(s) cannot be opened, it could trap passengers or delay their egress."

**D.    FCA's Knowledge of the Defect as Evidenced by Complaints of Other Class Members**

58.    An important source of field data is NHTSA's Consumer Complaint Database.  This publicly available database contains all motor vehicle-related consumer complaints submitted to NHTSA since January 2000. Consumers submit what is called a "Vehicle Owner Questionnaire" in which they asked to provide information that includes, the make, model, and model year of the vehicle, the approximate incident date, the mileage at which the incident occurred, whether the incident involved a crash or a fire, whether any persons were injured or killed in the incident, the speed of the vehicle at the time of the incident, and a description of the incident along with a description of the vehicle components they believe were involved in the incident.

59.    The majority of consumer complaints are submitted online at www.safercar.gov where consumers can input this information directly into the database through their computer.  They can also submit complaints by telephone through the Auto Safety Hotline, through submitting a paper Vehicle Owner Questionnaire form, and by mailing consumer letters to NHTSA.  This information

is then entered into NHTSA's ARTEMIS database where it can be searched and reviewed by the general public and vehicle manufacturers alike, by make, model, model year, and component.  NHTSA promotes this database as a valuable consumer information tool.

60.     Consumers have submitted hundreds of complaints about the Class Vehicles to the Consumer Complaint database about the Door Latch Defect. The vast majority of these complaints pre-date Plaintiff's purchase of her vehicle in 2018, including complaints that were publicly reported as far back as April 23, 2014. These complaints reveal that the Door Latch Defect extends far beyond just the 2016 and 2017 model year vehicles that are the subject of FCA's technical service bulletins and NHTSA's preliminary investigation. These complaints demonstrate a consistent issue with the Class Vehicles' door latches and door latch actuators extending from model year 2011 through model year 2018 Class Vehicles, as reflected in this table:

| Model Year | Dodge Grand Caravan | Chrysler Town & Country | Total Complaints |
|---|---|---|---|
| 2013 | 30 | 13 | 43 |
| 2014 | 13 | 31 | 44 |
| 2015 | 25 | 18 | 43 |
| 2016 | | | 476 |
| 2017 | 80 | N/A | 80 |
| 2018 | 43 | N/A | 43 |
| 2019 | 9 | N/A | 9 |
| | | Total | 738 |

61.     These complaints, registered on NHTSA's website, with the exception of the 476 complaints relating to model year 2016 Class Vehicles identified in NHTSA's Opening Resume of Preliminary Investigation, are set forth in Exhibit 1 to this Complaint.[2] A small representative sample of some of the oldest complaints is included here for ease of reference:

**April 23, 2014 NHTSA ID NUMBER: 10584504**
**Components: STRUCTURE**
**NHTSA ID Number:** 10584504

**Incident Date** July 17, 2013

**Consumer Location** NEWTON, NJ

**Vehicle Identification Number** 2C4RC1BGXDR****

**Summary of Complaint**

**CRASHNo**

**FIRENo**

**INJURIES0**

**DEATHS0**
TL* THE CONTACT OWNS A 2013 CHRYSLER TOWN AND COUNTRY VAN. THE CONTACT STATED THE DRIVER'S SIDE SLIDING DOOR WOULD CONSTANTLY BECOME STUCK. THE VEHICLE WAS TAKEN TO THE DEALER, WHERE THE TECHNICIAN DIAGNOSED THAT THE DOOR LATCH NEEDED TO BE REPLACED. THE REPAIRS WERE MADE TO THE VEHICLE. THE MANUFACTURE WAS NOT NOTIFIED OF THE FAILURE. THE FAILURE MILEAGE WAS 6,000 AND THE CURRENT MILEAGE WAS 14,000.

**1 Affected Product**

---

[2] These complaints are reproduced as they appear on NHTSA's website. Any typographical errors are attributable to the original author of the complaint.

## Vehicle

| MAKE | MODEL | YEAR |
|------|-------|------|
| CHRYSLER | TOWN AND COUNTRY | 2013 |

June 9, 2014 **NHTSA ID NUMBER: 10597074**
**Components: ELECTRICAL SYSTEM, STRUCTURE**
**NHTSA ID Number:** 10597074

**Incident Date** March 27, 2014

**Consumer Location** OCEANSIDE, NY

**Vehicle Identification Number** 2C4RC1CGXER****

**Summary of Complaint**

**CRASH**No

**FIRE**No

**INJURIES**0

**DEATHS**0

FROM AN HALF HOUR OF PICKING UP MY CAR AND GETTING IT HOME
I HAVE HAD A SEVERE SAFETY PROBLEM TO WHERE THE SLIDING
DOOR EITHER DOESN'T CLOSE ALL THE WAY OR IF IT DOES IT MAKES
A CLICKING NOISE AS IF TRY TO LATCH CLOSE. CALLED DEALER
RIGHT OF WAY BROUGHT IT BACK NEXT DAY SAID THE COMPUTER
FOR DOOR NEEDED TO BE UPDATED(REALLY BRAND NEW CAR)
WORKED WHILE I WAS THERE GOT HOME LATER THAT DAY
HAPPENED AGAIN DEALER LOOKED HAVE TO CHANGE MODULE
WAITED FOR PART TO COME GOT IT BACK STILL HAPPENING NOW
DEALER SAID LATCH NEEDED TO BE ADJUSTED SO THEY DID GOT IT
BACK STILL HAPPENING. GOT A CHRYSLER CASE MANAGER THEY
ARE DOING NOTHING ALL I ASKED WAS TO SWITCH CAR OUT SO
NONE OF MY KIDS FALL OUT AND GET HURT OR POSSIBLY DIE NO

ONE WANTS TO HELP STUCK WITH A DEFECTIVE VEHICLE FOR THE
NEXT 3 YEARS. NEVER AGAIN WILL I GET CHRYSLER OR
RECOMMEND ONE. HOPEFULLY NO ONE FALLS OUT OR THEY WILL
BE IN A LOT OF TROUBLE. *TR

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| CHRYSLER | TOWN AND COUNTRY | 2014 |

October 27, 2014 **NHTSA ID NUMBER: 10650220**
**Components: LATCHES/LOCKS/LINKAGES**
**NHTSA ID Number:** 10650220

**Incident Date** October 1, 2014

**Consumer Location** ANTIOCH, IL

**Vehicle Identification Number** 2C4RDGCG3DR****

**Summary of Complaint**

**CRASHNo**

**FIRENo**

**INJURIES0**

**DEATHS0**
TL* THE CONTACT OWNS A 2013 DODGE GRAND CARAVAN. THE
CONTACT STATED THAT THE REAR PASSENGER SIDE DOOR FAILED
TO LATCH. THE FAILURE OCCURRED TWICE. THE VEHICLE WAS NOT
DIAGNOSED OR REPAIRED. THE MANUFACTURER WAS NOTIFIED OF
THE FAILURE. THE APPROXIMATE FAILURE MILEAGE WAS 42,000.

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| DODGE | GRAND CARAVAN | 2013 |

May 28, 2015 **NHTSA ID NUMBER: 10722023**
**Components: ELECTRICAL SYSTEM**
**NHTSA ID Number:** 10722023

**Incident Date** March 18, 2015

**Consumer Location** BRUNSWICK, OH

**Vehicle Identification Number** 2C4RDGBG2DR****

**Summary of Complaint**

**CRASH**No

**FIRE**No

**INJURIES**0

**DEATHS**0
THE DOOR LOCKS STOPPED WORKING FOR BOTH THE LOCK BUTTON AND THE KEY FOB. THIS BECOMES A SAFETY ISSUE BECAUSE THE SIDE DOORS CAN BE LOCKED MANUALLY, BUT THE LIFT GATE DOES NOT HAVE A MANUAL LOCK. ADDITIONALLY ONLINE RESEARCH SHOWS THAT THE TIPM FAILURE CAN CAUSE CATASTROPHIC EVENTS SUCH AS SUDDEN AIRBAG DEPLOYMENT FOR NO REASON, FAILURE TO START, STALLING WHILE DRIVING, ETC.!! CHRYSLER IS SAID TO BE WELL AWARE OF THIS ISSUE AND HAS YET TO INITIATE A RECALL AND WE WERE PLANNING ON A FLORIDA VACATION THIS YEAR (WE LIVE IN OHIO) AND DUE TO THE POSSIBILITY OF GETTING STUCK ON OUR WAY OR ONCE THERE, WE DECIDED NOT TO GO TO THE DISMAY OF OUR KIDS. FIX THIS PROBLEM CHRYSLER AND QUIT SCREWING YOUR CUSTOMERS!!!

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| DODGE | GRAND CARAVAN | 2013 |

September 21, 2015 **NHTSA ID NUMBER: 10763639**
**Components: ELECTRICAL SYSTEM, LATCHES/LOCKS/LINKAGES**
NHTSA ID Number: 10763639

**Incident Date** August 16, 2015

**Consumer Location** MOREHEAD, KY

**Vehicle Identification Number** 2C4RDGCG9DR****

**Summary of Complaint**

**CRASH**No

**FIRE**No

**INJURIES**0

**DEATHS**0
2013 DODGE GRAND CARAVAN. CONSUMER WRITES IN REGARDS TO
DOOR LOCK ACTUATOR FAILED ON THE PASSENGER SIDE SLIDING
DOOR. *SMD THE CONSUMER STATED THE DOOR ACTUATOR
FAILURE, CAUSED THE BATTERY TO DRAIN AND WAS DAMAGED TO
THE POINT, WHERE IT HAD TO BE REPLACED. *JB

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| DODGE | GRAND CARAVAN | 2013 |

December 12, 2015 **NHTSA ID NUMBER: 10809794**

29

## Components: STRUCTURE

**NHTSA ID Number:** 10809794

**Incident Date** November 27, 2015

**Consumer Location** DEXTER, MO

**Vehicle Identification Number** 2C4RC18G7ER****

**Summary of Complaint**

**CRASH** No

**FIRE** No

**INJURIES** 0

**DEATHS** 0

DRIVERS SIDE SLIDING DOOR OPENS UNEXPECTEDLY WHEN CAR IS PARKED. TOOK TO DEALER AND THEY SAID IT WAS IN THE COMPUTER SYSTEM. A BAD LATCH THAT NEEDED REPLACEMENT. SINCE THIS HAPPENS IS IT NOT CONSIDERED A SAFETY HAZARD. ONLY HAD THE VEHICLE 4 MONTHS AND HAS BEEN DOING THIS FOR THREE WEEKS. WHILE SHOPPING, PARKED IN THE GARAGE, JUST WHENEVER THE CAR IS IN PARK.

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| CHRYSLER | TOWN AND COUNTRY | 2014 |

April 11, 2016 **NHTSA ID NUMBER: 10854752**
## Components: STRUCTURE

**NHTSA ID Number:** 10854752

**Incident Date** March 18, 2016

**Consumer Location** SUMMERVILLE, SC

**Vehicle Identification Number** 2C4RDGBG5DR****

**Summary of Complaint**

**CRASH**No

**FIRE**No

**INJURIES**0

**DEATHS**0

MANUALLY OPERATED SLIDING DOOR WILL NOT UNLOCK MAKING THE DOOR UNABLE TO BE OPENED. HOWEVER DRIVING DOWN THE HIGHWAY THE DOOR WILL OPEN ON ITS OWN. ONLY THE SAFETY LATCH KEEPS THE DOOR FROM OPENING ALL THE WAY. I CALLED DETROIT (800-423-6343 REP KAREN) AND REPORTED THE PROBLEM. SHE HAD ME CALL THE DEALER TO MAKE AN APPOINTMENT TO HAVE IT LOOKED AT. AS THE CAR IS JUST OUT OF WARRANTY, REPAIRS MAY OR MAY NOT BE COVERED.

**1 Affected Product**
**Vehicle**

| MAKE | MODEL | YEAR |
|------|-------|------|
| DODGE | CARAVAN | 2013 |

### E.     FCA's Warranties

62.     FCA has issued a Limited Vehicle Warranty for the class vehicles. Under the Limited Vehicle Warranty, FCA agreed to repair defects reported on the Class Vehicles within the earlier of 3 years or 36,000 miles. Repairs associated with the Door Latch Defect are included in this warranty.

63.     FCA instructs vehicle owners and lessees to bring their vehicles to a certified dealership for the warranty repairs. Many owners and lessees have

presented Class Vehicles to FCA-certified dealerships with complaints related to the Door Latch Defect.

64.     FCA has evaded its warranty obligations by (1) failing to tell consumers that the Class Vehicles are defective and (2) refusing to perform repairs to correct the Door Latch Defect.

## V      TOLLING OF STATUTES OF LIMITATIONS

65.     FCA's knowing and active concealment and denial of the facts alleged herein act to toll any applicable statute(s) of limitations.  Plaintiff and other Class members could not have reasonably discovered the true, latent nature of the Door Latch Defect until shortly before commencing this class-action litigation.

66.     In addition, even after Plaintiff and other Class members contacted FCA and/or its authorized dealers to repair the Door Latch Defect, FCA and/or its dealers repeatedly and consistently told them the Class Vehicles were not defective.

67.     FCA has had, and continues to have, a duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Class Vehicles, including the facts that the Class Vehicles require costly repairs, pose safety concerns, and have a diminished resale value. As a result of FCA's active concealment, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI    CLASS ACTION ALLEGATIONS

68.    Plaintiff brings this action as a class action pursuant to Federal Rule of

Civil Procedure 23(a), (b)(2), and (b)(3) on behalf of the following class:

> **The Nationwide Class:**
> All persons or entities in the United States who are current or former
> owners and/or lessees of a Class Vehicle.

69.    Alternatively, Plaintiff proposes the following state-specific sub-

classes:

> **The Maine Class:**
> All persons or entities in Maine who are current or former owners
> and/or lessees of a Class Vehicle.

70.    Excluded from the Classes are Defendant, its affiliates, employees,

officers and directors, persons or entities that purchased the Class Vehicles for

resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify,

change, or expand the Class definition.

71.    Certification of Plaintiff's claims for class-wide treatment is

appropriate because Plaintiff can prove the elements of her claims on a class-wide

basis using the same evidence as would be used to prove those elements in individual

actions alleging the same claim.

72.    This action has been brought and may be properly maintained on behalf

of each of the Classes proposed herein under Federal Rule of Civil Procedure 23.

73.   **Numerosity of the Class (Federal Rule of Civil Procedure 23(a)(1))** – The members of the Class are so numerous that their individual joinder is impracticable. Plaintiff is informed and believe that hundreds of thousands of Class Vehicles were sold across the United States. The number and identity of Class members can be obtained through business records regularly maintained by Defendant, its employees, and agents and state agencies. Members of the Class can be notified of the pending action by e-mail and mail, supplemented by published notice, if necessary.

74.   **Commonality and Predominance (Federal Rule of Civil Procedure 23(a)(2))** – There are questions of law and fact common to the Class. These questions predominate over any questions only affecting individual Class members. The common legal and factual issues include, but are not limited to:

    a.  Whether Defendant engaged in the conduct alleged herein;

    b.  Whether Defendant designed, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

    c.  Whether Defendant designed, manufactured, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States knowing the door latching system was prone to malfunction;

    d.  When Defendant learned of the Door Latch Defect;

    e.  Whether Defendant concealed the Door Latch Defect from consumers;

    f.  Whether Plaintiff and other Class members have been harmed by the fraud alleged herein;

    g.  Whether Defendant was unjustly enriched by its deceptive practices;

    h.  Whether Plaintiff and members of the Class are entitled to equitable relief in the form of rescission of the purchase agreement or other injunctive relief and, if so, in what amount.

75.  **<u>Typicality (Federal Rule of Civil Procedure 23(a)(3))</u>** – Plaintiff's claims are typical of the claims of each member of the Class. Plaintiff, like all other members of the Class, have sustained damages arising from FCA's conduct as alleged herein. Plaintiff and the members of the Class were and are similarly or identically harmed by FCA's unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct.

76.  **<u>Adequacy (Federal Rule of Civil Procedure 23(a)(4))</u>** – Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation. There are no material conflicts between Plaintiff's claims and those of the members of the Class that would make class

certification inappropriate. Counsel for the Class will vigorously assert the claims of all Class members.

77.     **<u>Superiority (Federal Rule of Civil Procedure 23(b)(3))</u>** – This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3), because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class and a class action is superior to other available means for the fair and efficient adjudication of this dispute. The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendant's conduct. Further, it would be virtually impossible for the members of the Class to individually redress effectively the wrongs done to them. Even if Class members themselves could afford such individual litigation, the court system could not. In addition, individualized litigation increases the delay and expense to all parties and to the court system resulting from complex legal and factual issues of the case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

78.    Plaintiff contemplates the eventual issuance of notice to the proposed Class members setting forth the subject and nature of the instant action. Upon information and belief, Defendant's own business records and electronic media can be utilized for the contemplated notices. To the extent that any further notices may be required, Plaintiff would contemplate the use of additional media and/or mailings.

## VII    CAUSES OF ACTION

**A.    Claims Brought on Behalf of the Nationwide Class**

## COUNT I

## VIOLATIONS OF THE MAGNUSSON-MOSS WARRANTY ACT

**(Brought by Plaintiff on Behalf of the Nationwide Class)**

79.    Plaintiff and the Class incorporates by reference each preceding and succeeding paragraph as though fully set forth at length herein.

80.    Plaintiff brings this claim on behalf of themselves and on behalf of the Nationwide Class or, alternatively, on behalf of the State subclasses.

81.    Plaintiff and the Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

82.    FCA is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5).

83.    The Class Vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

84.     FCA's 3 year/36,000 miles Limited Basic Warranty is a "written warranties" within the meaning of 15 U.S.C. § 2301(6).

85.     FCA breached the express warranties by:

86.     Selling and leasing Class Vehicles with suspensions/steering linkage system that were defective in materials and/or workmanship, requiring repair or replacement within the warranty period; and

87.     Refusing and/or failing to honor the express warranties by repairing or replacing, free of charge, the suspension or any of its component parts in order to remedy the Door Latch Defect.

88.     Plaintiff and the other Class members relied on the existence and length of the express warranties in deciding whether to purchase or lease the Class Vehicles.

89.     FCA's breach of the express warranties has deprived Plaintiff and the other Class members of the benefit of their bargain.

90.     The amount in controversy of Plaintiff's individual claims meets or exceeds the sum or value of $25.00.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

91.     FCA has been afforded a reasonable opportunity to cure their breach of the written warranties and/or Plaintiff and the other Class members were not required to do so because affording FCA a reasonable opportunity to cure their breach of

written warranties would have been futile.  FCA was also on notice of the alleged

defect from the complaints and service requests it received from Class members, as

well as from their own warranty claims, customer complaint data, and/or parts sales

data.

92.    As a direct and proximate cause of FCA's breach of the written

warranties, Plaintiff and the other Class members sustained damages and other losses

in an amount to be determined at trial.  FCA's conduct damaged Plaintiff and the

other Class members, who are entitled to recover actual damages, consequential

damages, specific performance, diminution in value, costs, including statutory

attorney fees and/or other relief as deemed appropriate.

**B.    Claims Brought on Behalf of the Maine Class**

## COUNT II

## VIOLATION OF MAINE UNFAIR TRADE PRACTICES ACT

**(Me. Rev. Stat. Ann. Tit. 5 § 205-a *et seq.*)**

**(Brought by Plaintiff on Behalf the Maine Class)**

93.    Plaintiff and the Class incorporate by reference each preceding and

succeeding paragraph as though fully set forth herein.

94.    Plaintiff brings this cause of action against FCA on behalf of herself

and the Maine Class.

95.     Plaintiff, the Maine State Class members, and FCA are "persons" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(2).

96.     FCA is engaged in "trade" or "commerce" within the meaning of Me. Rev. Stat. Ann. Tit. 5 § 206(3)

97.     The Maine Unfair Trade Practices Act ("Maine UTPA") makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce…." Me. Rev. Stat. Ann. Tit. 5 § 207.

98.     In the course of its business, through its agents, employees, and/or subsidiaries, violated the Maine UTPA as detailed above. Specifically, in marketing, offering for sale, and selling the defective Class Vehicles, FCA engaged in one or more of the following unfair or deceptive acts or practices as defined in Me. Rev. Stat. Ann. Tit. 5 § 207:

(1) Causing likelihood of confusion or of misunderstanding as to the approval or certification of the Class Vehicles;

(2) Representing that the Class Vehicles have approval, characteristics, uses, or benefits that they do not have;

(3) Representing that the Class Vehicles are of a particular standard, quality and grade when they are not;

(4) Advertising the Class Vehicles with the intent not to sell or lease them as advertised;

(5) Engaging in other conduct which created a likelihood of confusion or of misunderstanding; or

(6) Using or employing deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of a material fact with intent that others rely upon such concealment, suppression or omission, in connection with the advertisement and sale/lease of the Class Vehicles, whether or not any person has in fact been misled, deceived or damaged thereby.

99.     FCA's concealment of the Door Latch Defect in the Class Vehicles were material to Plaintiff and the Maine Class. Had they known of the Door Latch Defect, Plaintiff and the Maine Class would not have purchased or leased the Class Vehicles, or—if the Class Vehicles' true nature had been disclosed and mitigated, they would have paid significantly less for them.

100.    The Maine Class members had no way of discerning that FCA's representations were false and misleading, or otherwise learning the facts that FCA's had concealed or failed to disclose the Door Latch Defect in the Class Vehicles.

101.    FCA had an ongoing duty to the Maine Class members to refrain from unfair and deceptive practices under the Maine UTPA in the course of their business.

102.    FCA owed Plaintiff and the Maine Class members a duty to disclose all the material facts concerning the Suspension Defect because they possessed

exclusive knowledge, they intentionally concealed it from the Maine Class members, and/or they made misrepresentations that were rendered misleading because they were contradicted by withheld facts.

103.   Plaintiff and the Maine Class members suffered ascertainable loss and actual damages as a direct and proximate result of FCA's concealment, misrepresentations, and/or failure to disclose material information.

104.   FCA's violations present a continuing risk to the Maine Class members, as well as to the general public. FCA's unlawful acts and practices complained of herein affect the public interest.

105.   Pursuant to Me. Rev. Stat. Ann. Tit. 5 § 213, Plaintiff and the Maine Class members seek an order awarding damages, punitive damages, and any other just and proper relief available under the Maine UTPA.

## COUNT III

## FRAUDULENT CONCEALMENT

### (Based on Maine Law)

### (Brought by Plaintiff on Behalf of the Maine Class)

106.   Plaintiff and the Class incorporate by reference each preceding paragraph as though fully set forth herein.

107.   Plaintiff brings this count on behalf of herself and the Maine Class members.

108.   FCA made material omissions concerning a presently existing or past fact in that, for example, FCA did not fully and truthfully disclose to its customers the true nature of the Door Latch Defect which was not readily discoverable until many years after purchase or lease of the Class Vehicles. These facts, and other facts as set forth above, were material because reasonable people attach importance to their existence or nonexistence in deciding which vehicle to purchase.

109.   FCA was under a duty to disclose these omitted facts, because where one does speak one must speak the whole truth and not conceal any facts which materially qualify those facts stated. One who volunteers information must be truthful, and the telling of a half-truth calculated to deceive is fraud.

110.   In addition, FCA had a duty to disclose these omitted material facts because they were known and/or accessible only to FCA who had superior knowledge and access to the facts, and FCA knew they were not known to or reasonably discoverable by Plaintiff and the Maine Class members. These omitted facts were material because they directly impact the safety of the Class Vehicles.

111.   FCA was in exclusive control of the material facts and such facts were not known to the public or the Maine Class members. FCA also possessed exclusive knowledge of the defects rendering Class Vehicles inherently more dangerous and unreliable than similar vehicles.

112.   FCA actively concealed and/or suppressed these material facts, in whole or in part, with the intent to induce Plaintiff and the Maine Class members to purchase the Class Vehicles at a higher price for the vehicles, which did not match the vehicles' true value.

113.   Plaintiff and the Maine Class members were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts. The actions of Plaintiff and the Maine Class members were justified.

114.   Plaintiff and the Maine Class members reasonably relied on these omissions and suffered damages as a result.

115.   As a result of these omissions and concealments, Plaintiff and the Maine Class members incurred damages including loss of intrinsic value and out-of-pocket costs related to repair of the systems.

116.   As a result of the concealment and/or suppression of the facts, Plaintiff and the Maine Class members sustained damage. Plaintiff and the Maine Class members reserve their right to elect either to (a) rescind their purchase or lease of the Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the Class Vehicles and recover damages.

117.   As a result of these omissions and concealments, Plaintiff and the Maine members incurred damages including loss of intrinsic value and out-of-pocket costs related to repair of the systems.

118.   FCA's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of the rights of Plaintiff and the Maine members. FCA's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT IV

## BREACH OF IMPLIED WARRANTY

**(Me. Rev. State Tit. 11 §§ 2-314 and 2-1212)**

**(Brought by Plaintiff on Behalf of the Maine Class)**

119.   Plaintiff and the Class incorporates by reference each preceding and succeeding paragraph as though fully set forth herein.

120.   Plaintiff brings this count on behalf of herself and the Maine Class.

121.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

122.   FCA was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

123.   With respect to leases, FCA was all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

124.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Me. Rev. Stat. Ann. Tit. 11 §§ 2-314, and 2-1212.

125.   FCA sold and/or leased Class Vehicles that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. The Class Vehicles were not in merchantable condition because their design violated state and federal laws.

126.   The Class Vehicles were not fit for their ordinary purpose of providing safe and reliable transportation.

127.   FCA breaches of the implied warranty of merchantability caused damage to the members of the Maine State Class in an amount of damages to be proven at trial.

## COUNT V

## BREACH OF EXPRESS WARRANTY

### (Me. Rev. Stat. Tit. §§ 2-313 and 2-1210)

### (Brought by Plaintiff on Behalf of the Maine Class)

128.   Plaintiff and the Class incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

129.   Plaintiff brings this count on behalf of herself and the Maine Class.

130.   FCA was at all relevant times a "merchant" with respect to motor vehicles under Me. Rev. Stat. Ann. Tit. 11 §§ 2-104(1), and 2-1103(3), and is a "seller" of motor vehicles under § 2-103(1)(d).

131.   With respect to leases, FCA was all relevant times a "lessor" of motor vehicles under Me. Rev. Stat. Ann. Tit. 11 § 2-1103(1)(p).

132.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Me. Rev. Stat. Ann. Tit. 11 §§ 2-105(1), and 2-1103(1)(h).

133.   In connection with the sale or lease of the Class Vehicles, FCA provided purchasers of the Class Vehicles with its 3-year/36,000-mile New Vehicle Limited Warranty, which was an express warranty and became part of the basis of the parties' bargain.

134.   FCA's warranty formed a basis of the bargain that were reached when Plaintiff and other Maine Class members purchased or leased their Class Vehicles.

135.   Plaintiff and the Maine Class members experienced the Door Latch Defect within the warranty period. Despite the existence of warranties, FCA failed to inform Plaintiff and Maine Class members Class Vehicles contained the Defect.

136.   FCA breached the express warranty by failing to provide Plaintiff and the Maine Class members with a remedy to the Door Latch Defect at no cost to Plaintiff.

137.   Finally, because of FCA's breach of warranty as set forth herein, Plaintiff and the other Maine Class members assert, as additional and/or alternative remedies, the revocation of acceptance of the goods and the return to Plaintiff and the other Maine Class members of the purchase or lease price of all Class Vehicles currently owned or leased, and for such other incidental and consequential damages allow.

## VIII   PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.      For an order certifying this action as a class action;

2.      For an order appointing Plaintiff as a representative of the Class and Plaintiff's counsel of record as Class counsel;

3.      For an award of actual, general, special, incidental, statutory, compensatory, and consequential damages and in an amount to be proven at trial;

4.      For an award of exemplary and punitive damages in an amount to be proven at trial;

5.      For an order enjoining the wrongful conduct alleged herein;

6.      For costs;

7.      For interest;

8.      For such equitable relief as the Court deems just and appropriate, including but not limited to, rescission; restitution; and disgorgement; and

9.      For such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

Dated:  July 21, 2021

**THE MILLER LAW FIRM, P.C.**

*/s/ E. Powell Miller*
E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P81118)
950 W. University Dr., Suite 300
Rochester, MI 48307
Telephone: (248) 841-2200
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

**MCCUNE WRIGHT AREVALO LLP**
Richard D. McCune
David C. Wright
Steven A. Haskins
Mark I. Richards
3281 East Guasti Road, Suite 100
Ontario, California 91761

Telephone: (909) 557-1250

*Attorneys for Plaintiff and the*
*Proposed Class*