UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LISA WHITE et al.,

Plaintiffs,

v.

FCA US LLC,

Defendant.

Case No. 21-11696
Honorable Shalina D. Kumar
Magistrate Judge David R. Grand

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS (ECF NO. 26)

### I.    Introduction

In this putative class action complaint, plaintiffs Lisa White, Kelly Dobransky, Arthur Zadrozny, Kelly Mayor, and Melissa Eisenhart sue FCA US LLC (FCA) on behalf of proposed state and nationwide classes, alleging FCA failed to disclose a known safety issue with its electronic door locking system in violation of various state and federal laws. ECF No. 10.

FCA moved to dismiss plaintiffs' claims. ECF No. 26. This motion is fully briefed and the Court heard oral argument on February 15, 2023. ECF Nos. 47, 49, 51.

For the reasons set forth below, the Court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss (ECF No. 26).

## II.   Facts

## A.   Alleged defect

Powered door latches, also known as electronic locks, allow a driver to simultaneously lock or unlock all the passenger doors of an automobile by pressing an interior button or using a key fob. ECF No. 10, PageID.296-99. Such electronic locking systems rely on door lock actuators, which are electric motors that control the latching, locking, unlatching, and unlocking in the system. *Id.* at PageID.299.

Plaintiffs allege the door lock actuators in the class vehicles are insufficiently robust, causing the cars' electronic locking systems to fail. *Id.* at PageID.297-304. If the system fails in the locked position, the doors are frozen either open or closed. If it fails in the unlocked position, the doors cannot be locked, and thus can be opened, including while driving. *Id.*

## B.   FCA's knowledge of the defect

Plaintiffs allege FCA knew of the defect since at least 2008. The National Highway Traffic Safety Administration (NHTSA) (a government agency responsible for transportation safety) has received hundreds of complaints regarding the electronic locking defect in class vehicles, including numerous detailed complaints in 2007 and 2008. ECF No. 10,

PageID.3124. These complaints are publicly available. *Id.* at PageID.310.

Plaintiffs allege FCA monitors these complaints and therefore knew of the

defect. *Id.*

Plaintiffs hypothesize that this large number of NHTSA complaints

regarding the locking defect was likely accompanied by a large number of

warranty claims regarding the locking defect, along with required repairs

and replacement parts. *Id.* at PageID.312. Plaintiffs claim FCA monitors

warranty claims, repairs, and replacement part trends and therefore likely

knew of the defect but note they do not have access to this information

without discovery.

Plaintiffs further allege that the pre-release testing FCA conducts on

its vehicles "should have" revealed that the door actuators' components

were not sufficiently robust for their intended purpose, but again note that

they do not have access to the results of that testing and analysis without

discovery. *Id.* at PageID.311-12.

As evidence that FCA knew of the defect, plaintiffs point to two

internal Technical Service Bulletins (TSB) that FCA issued to its dealers

and a subsequent investigation by NHTSA regarding the door lock

actuator. The first TSB, issued in 2016, instructed dealers that when they

receive complaints about sliding doors failing to open or close, they should first inspect the door actuator. ECF No. 10, PageID.325. If the actuator showed issues, dealers were instructed to replace it with an identical part. *Id.* The second TSB, issued in 2020, instructed dealers to replace door lock actuators. *Id.* at PageID.326. In 2021, NHTSA launched a Defects Investigation into this issue, citing 476 complaints it received and safety concerns these complaints highlighted. *Id.* As a result of these issues, FCA offered owners of these vehicles an extended warranty to 15 years/150,000 miles for "sliding door lock actuators." ECF No. 26, PageID.1251.

Both TSBs and the NHTSA investigation cover 2016 and 2017 Dodge Grand Caravan and Chrysler Town & Country vehicles. ECF No. 10, PageID.325. These vehicles are a subset of the proposed class vehicles, though no named plaintiff owns one. *Id.*; ECF No. 26, PageID.1251. Plaintiffs note all class vehicles share the same relevant parts in their locking systems. ECF No. 33, PageID.1468. Plaintiff also argues FCA's extended warranty for this subclass is not a real remedy, because it involves replacing one defective door lock actuator with an equally defective one, since the actuator remains the same.

### C.  FCA's warranties

Page **4** of **42**

When sold new, class vehicles were protected by a 3-year/36,000-mile warranty promising "repair" of "any item on your vehicle when it left the manufacturing plant that is defective in material, workmanship or factory preparation."

### D.   Plaintiffs and their vehicles

1. Lisa White (Maine): White purchased a new 2018 Dodge Caravan on September 15, 2018 in Maine. ECF No. 10, PageID.288. In 2021, she observed the rear passenger side door failing to lock. *Id.* She brought it to the dealership on March 12, 2021 when it had 53,429 miles on it. *Id.* The dealership replaced the failed parts and charged her $630.80. *Id.*

2. Kelly Dobransky (Pennsylvania): Dobransky bought a used 2015 Chrysler Town & Country on June 7, 2016 in Pennsylvania. *Id.* at PageID.289. In 2017, she observed the rear door not responding to remote, switch, or manual commands. *Id.* She brought her vehicle to a dealership within the warranty period, which replaced her door lock actuator under warranty. *Id.* at PageID.290. However, the replacement parts did not cure the defect and in October 2020, the rear sliding door again became inoperable. *Id.* She again presented

the vehicle for repair at the dealership, but the dealership insisted she pay for the work. *Id.*

3. Arthur Zadrozny (Virginia): Zadrozny purchased a new 2015 Dodge Caravan in February 2015 in Virginia. *Id.* at PageID.291. In October 2020, when the car had roughly 80,000 miles on it, he observed the rear sliding door not responding to remote, switch, or manual commands. *Id.* He brought his car to a dealership but was denied free repair. *Id.*

4. Kelly Mayor (Florida): Mayor purchased a new 2017 Dodge Caravan on October 23, 2017 in Virginia. *Id.* at PageID.292. In June 2021, Mayor discovered that both rear sliding doors failed to lock. *Id.* On July 28, 2021, she brought the vehicle to a dealership, which recommended lock actuator replacement for both doors and quoted her $1,875.97 for the repair. *Id.* Mayor alleges she called Dodge customer service, which offered to pay for only part of the repair. *Id.*

5. Melissa Eisenhart (Hawaii): Eisenhart purchased a used 2015 Dodge Caravan in September 2017 in Hawaii. *Id.* at 294. In 2019, Eisenhart discovered the passenger sliding door failed to lock, which also rendered the alarm system inoperable. *Id.* In 2021, she brought the

car to a dealership, but ultimately was told the dealership would

charge $100 just to diagnose the problem because electrical

problems were not covered under the warranty. *Id.* She declined to

pay for the diagnosis. *Id.*

### A.    Proposed classes and claims

Plaintiffs propose a nationwide class of "[a]ll persons or entities in the

United States who are current or former owners and/or lessees of a Class

Vehicle" and five state-based subclasses for purchasers of class vehicles in

Florida, Hawaii, Maine, Pennsylvania, and Virginia. ECF No. 10,

PageID.339-40.

On behalf of the putative nationwide class, plaintiffs claim violation of

the Magnuson-Moss Warranty Act (MMWA) (Count I). *Id.* at PageID.345-

47. On behalf of the putative state subclasses, plaintiffs bring claims for

violation of their states' respective consumer protection statutes (Counts II,

VIII, IX, XIV, XVIII, and XXII),  breach of express warranty (Counts III, X,

XVII, XIX, and XXII), breach of implied warranty (Counts IV, XI, XVI, XX,

and XXIV), common law breach of contract/warranty (Counts V and XII),

fraudulent concealment/omission (Counts VI, XV, XXI, and XXV), and

unjust enrichment (Counts VII and XIII). *Id.* at PageID.348-96.

### III.    Analysis

### A.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Golf Village N., LLC v. City of Powell, Ohio*, 14 F.4th 611, 617 (6th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) and *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts construe the complaint in the light most favorable to the plaintiffs and draw all reasonable inferences in their favor. *Golf Village*, 14 F.4th at 617 (citing *Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 897 (6th Cir. 2019)). When a complaint does adequately state a claim, it may not be dismissed based on the court's "assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder." *Twombly*, 550 U.S. at 563, n.8.

### B.    Breach of warranty/contract claims

Plaintiffs assert MMWA claims on behalf of the nationwide class and various breach of warranty/contract claims on behalf of the proposed state subclasses under the laws of the states in which they reside, Florida, Hawaii, Maine, Pennsylvania, and Virginia.

### 1.  State breach of warranty/contract claims

Each plaintiff claims breach of express warranty, and Mayor and Eisenhart plead in the alternative breach of contract/common law warranty claims under Florida and Hawaii law. ECF No. 10, PageID.354, 367.

First, plaintiff Mayor purchased her car in Virginia but brought her warranty claims (Counts III and V) under the laws of Florida. A plaintiff may only invoke the warranty laws of the state where he or she purchased a vehicle. Flores, 2021 WL 1122216, at *6. Plaintiffs concede this point. ECF No. 33, PageID.1475, n. 7. Mayor's breach of warranty/contract claims under Florida law are **DISMISSED**.

Second, several of the express warranty claims must be dismissed because plaintiffs fail to plead facts showing a breach occurred. FCA's express warranty guarantees repair only if the vehicle is presented for repair within the warranty period, three years or 36,000 miles, whichever occurs first. White presented her car for repair when it had 53,429 miles on

it. Zadrozny presented his car for repair when it had over 80,000 miles on

it. And Eisenhart presented her 2015 car in 2021. In each of these

situations, plaintiffs cannot show their express warranty was breached

because they did not submit any warranty claim within the warranty period.

The express warranty claims on behalf of White, Zadrozny, and Eisenhart

are **DISMISSED**.

As to the remaining express warranty claim by Dobransky, FCA

argues first that she alleges only a design defect, which is not covered by

its warranty. FCA's warranty covers any defect due to material,

workmanship, or factory preparation. ECF No. 26, PageID.1258. It does not

cover design defects. *Id.* However, plaintiffs plausibly allege the defect is

caused by either a design or manufacturing defect. Specifically, the

amended complaint alleges the Sliding Door Latch is a "material design

and manufacturing defect", that the class vehicles "used the same design,

manufacturing, and parts," that the putative class vehicles "were

manufactured with insufficient and defective sliding door latch systems",

that "FCA knew . . . the door latch system and its components required

certain design and manufacturing characteristics to endure the

circumstances to which they are exposed", that FCA may have "designed,

manufactured . . . Class Vehicles . . . knowing the door latching system was prone to malfunction", that "FCA knew that the Class Vehicles were defectively designed or manufactured", and that the defect could be caused by component wear, which could in turn be caused by inferior materials or manufacturing issues. *See* ECF No. 10, ¶¶ 1, 68-69, 80, 105-106, 164, 240, 73, 79-80. Accordingly, FCA's contentions that its warranty does not apply are unavailing. *See Francis v. General Motors, LLC.*, 504 F. Supp. 3d 659, 673 (E.D. Mich. 2020); *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 288 (E.D. Mich. 2021).

FCA further argues Dobransky does not allege facts sufficient to show it breached her warranty. Dobransky presented her vehicle and received a repair under the warranty. However, plaintiff asserts the repair was ineffective because the dealer simply replaced defective actuator with another equally defective actuator, and as a result, Dobransky again experienced locking system failures. Dobransky adequately pleads FCA breached its express warranty. *See Reynolds v. FCA US LLC*, 546 F. Supp. 3d 635 (E.D. Mich. 2021) (noting "[i]mplicit [in a repair warranty] is a promise that such repairs will actually remedy the problem at issue" and

declining to dismiss the express warranty claims where plaintiffs alleged that that the defect was not cured by defendant's repair effort).

### 2. Warranty of merchantability claims

FCA argues plaintiffs fail to plead facts showing the defect rendered their vehicles unmerchantable, because the defect did not begin affecting the vehicles until several years after purchase and the drivers continued to use the vehicles after the defects began to present problems. A claim for breach of implied warranty is only viable if the vehicles are less than "suitable for [their] ordinary purpose." *Masforce Europe, BVBA v. Mastry Marine & Indus. Design, Inc.*, 2013 WL 12156533, at *9 (M.D. Fla. 2013). Plaintiffs plausibly allege that the locking defect renders their vehicles unsuitable for their ordinary purpose, because it compromised the safety and reliability of their vehicles. Specifically, the defect can freeze doors in the open position, rendering the vehicle inoperable; freeze doors in the closed position, trapping occupants in an emergency situation or forcing them to climb up and exit through the front doors; or result in the rear doors being unable to lock, rendering the vehicle unsafe for transporting children.

FCA's argument that plaintiffs cannot sustain their merchantability claims because they continued to use their vehicles is an "attempt to define

a vehicle as unfit only if it does not provide transportation [and] is an unjustified dilution of the implied warranty of merchantability." *Isip v. Mercedes-Benz, USA, LLC*, 155 Cal. App. 4th 19, 27 (2007). Rather, "merchantability implies not only that a vehicle can provide transportation, but that it can do so in a reasonably safe and controlled manner." *In re FCA Monostable*, 280 F. Supp. 3d at 1015; *see also Francis*, 504 F. Supp. 3d at 675 ("[F]or an automobile to be merchantable in the usual sense, the law requires more than that it simply move from point to point under its own power. Ordinary car buyers reasonably expect, and the law allows that they should expect, cars not only to 'provide transportation,' but also to do so in a reasonably safe and reliable manner"). The Court rejects FCA's argument.

FCA further argues that plaintiffs' implied warranty claims fail because they did not seek warranty service within the express warranty period. This misunderstands implied warranty claims involving latent defects. Plaintiffs do not argue that the implied warranty was breached when they presented a vehicle for repair and were denied; they argue the warranty was breached at the point of sale, because they were sold vehicles that, due to the latent, uniform locking defect, were never fit for

their intended purpose. This kind of claim does not require that plaintiffs sought repair during the warranty period. *Chapman v. GM LLC*, 531 F. Supp. 3d 1257, 1278 (E.D. Mich. 2021) (declining to dismiss implied warranty claim where plaintiffs alleged a uniform, latent defect that rendered all trucks in the proposed class unmerchantable at the point of sale) (citing *Varner v. Dometic Corp.*, 2017 WL 3730618, at *10 (S.D. Fla. Feb. 7, 2017) (collecting cases); *Sloan v. Gen. Motors LLC*, 287 F. Supp. 3d 840, 880 (N.D. Cal. 2018) ("the defect was inherent to the engine design and, therefore, existed at the time of purchase.")). The Court rejects FCA's argument on this point too. The Court will not dismiss plaintiffs' warranty of merchantability claims on these grounds.

However, plaintiff Mayor presents a different issue. Mayor purchased her vehicle used from a third-party dealership. ECF No. 10, PageID.292. She brings her implied warranty claim under Florida law. *Id.* at 352. She therefore lacks privity with FCA, a requirement under Florida's implied warranty law. *See Gant v. Ford Motor Co.*, 517 F.Supp.3d 707, 2021 WL 364250, *5 (E.D. Mich. 2021) (dismissing implied warranty claims under Florida law for lack of privity). Her implied warranty claim (Count IV) is **DISMISSED**.

Page **14** of **42**

### 3. Statute of limitations

The laws of Virginia, Pennsylvania, and Hawaii require that warranty claims be brought within four years of the vehicle's date of delivery. *See, e.g., Wilson v. Volkswagen Grp. of America, Inc.*, 2018 WL 4623539, at *7 (S.D. Fla. 2018) (Virginia law); *Vullings v. Bryant Heating & Cooling Sys.*, 2019 WL 687881, *2 (E.D. Pa. 2019); *Honolulu Academy of Arts v. Greene*, 2016 WL 4522667, *5 (D. Haw. 2016).

Plaintiffs Dobransky (Pennslylvania), Zadrozny (Virginia), and Eisenhart (Hawaii) brought their claims outside this window. Plaintiffs argue Eisenhart brought her claim within the window because she purchased her car in September 2017, but fail to account for the fact that she purchased her car used. ECF No. 33, PageID.1478. The statute of limitations begins to run from the original date of delivery, in this case June 23, 2015, not the repurchase date. ECF No. 35, PageID.1507.

Plaintiffs argue their warranty claims are tolled because of the latent nature of the alleged defect and FCA's fraudulent concealment of the defect. ECF No. 33, PageID.1478. "In Hawaii, the statute of limitations is tolled if the defendant fraudulently conceals the existence of a cause of action. . . . The liable party's acts of fraudulent concealment must be

affirmative and fraudulent in character and those actions must conceal a *known* cause of action." *Ryan v. Ford Motor Co.*, 15 F.3d 1089 (9th Cir. 1994) (internal citations omitted).

In other words, plaintiffs must "establish *affirmative* conduct on the part of the defendants which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief." *Id.* (emphasis original) (internal citations and quotation omitted). Pennsylvania and Virginia impose similar requirements. *See Soutner v. Covidien, LP*, 2019 WL 3801438, at *5 (M.D. Penn. Aug. 13, 2019) (Pennsylvania); *Evans v. Trinity Indus., Inc.*, 137 F. Supp. 3d 877, 882 (E.D. Va. 2015) (Virginia).

Plaintiffs do not allege sufficiently specific affirmative conduct by FCA to support their tolling arguments. The only affirmative conduct that plaintiffs allege is that FCA failed to disclose the defect and issued the two TSBs. Neither of these represents an affirmative act to conceal the defect or lead a reasonable person to believe they did not have any claim for relief. Accordingly, the warranty claims by Dobransky, Zadrozny, and Eisenhart are time-barred and therefore **DISMISSED**.

### 4. Pre-suit notice

The Court does not address FCA's pre-suit notice argument because the Court has already determined that the warranty claims involved—Mayor (Florida), Dobransky (Pennsylvania), and Zadrozny (Virginia)—should be dismissed.

### 5. MMWA claim

MMWA claims "rise or fall" with the underlying express and implied warranty claims under state law. *See, e.g., Straub v. Ford Motor Co.*, 2021 WL 5085830, at *11 (E.D. Mich. 2021). All plaintiffs' state law warranty claims fail except White's implied warranty of merchantability claim. Accordingly, only that claim can support a MMWA claim.

FCA argues plaintiffs lack standing to bring MMWA claims on behalf of the nationwide class. ECF No. 26, PageID.1257. The Court reserves consideration of this question for the class certification stage. *See Chapman v. GM LLC*, 531 F. Supp. 3d 1257, 1274 (E.D. Mich. 2021) (deferring analogous standing question to class certification stage).

## C.    Fraud-based claims

Plaintiffs assert violations of the consumer protection statutes of the states where they reside, as well as common law fraudulent

concealment/omission and unjust enrichment claims. FCA argues these claims should be dismissed.

### 1. Plaintiffs adequately plead fraudulent omission

FCA argues plaintiffs fail to plead fraud by omission.[1] ECF No. 26, PageID.1266. Federal Rule of Civil Procedure 9(b) provides a heightened pleading standard for fraud claims: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). "In the context of a fraudulent-omission claim, the plaintiff can succeed without the same level of specificity required by a normal fraud claim*, . . .* but must still allege "the who, what, when, where, and how" of the omission[.]" *Gregorio v. Ford Motor Co.*, 522 F. Supp. 3d 264, 277 (E.D. Mich. 2021) (internal quotations and citations omitted). "A complaint can meet these requirements 'if it alleges that a manufacturer knew of a defect before sale, the various venues the manufacturer used to sell the product failed to disclose the defect, and that the plaintiffs would not have purchased the product or would have paid less

---

[1] FCA also argues plaintiffs fail to plead fraud by affirmative representation. ECF No. 26, PageID.1266. However, plaintiffs do not attempt to plead fraud by affirmative misrepresentation. *See* ECF No. 33, PageID.1481. Accordingly, the Court disregards this argument.

for it had they known of the defect.' *Id.* (quoting *Wozniak v. Ford Motor Co.*,

2019 WL 108845, at *3 (E.D. Mich. Jan. 4, 2019)).

Plaintiffs meet these requirements. Plaintiffs allege the "who" (FCA),

the "what" (FCA's failure to disclose the defect despite its knowledge of the

defect), the "when" (prior to the sale of Class Vehicles), the "where" (the

various channels of information though which FCA advertised and sold

Class Vehicles), and the "how" (had Plaintiffs known of the defect, they

would not have purchased the Class Vehicles or would have paid less for

them) of the alleged omission. ECF No. 33, PageID.1482; *see Gregorio*,

522 F. Supp. 3d at 277 ("Ford's arguments that Plaintiffs fail to allege the

'who, what, when, where, and how' do not withstand scrutiny. As another

court put it, 'In short, the "who" is Ford, the "what" is its knowledge of a

defect, the "when" is prior to the sale of Class Vehicles, and the "where" is

the various channels of information through which Ford sold Class

Vehicles.'") (quoting *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087,

1096 (N.D. Cal. 2014)); *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, 751-52

(E.D. Mich. 2017) ("Beck has adequately pleaded the 'who' (FCA), the

'what' (knowing about, yet failing to disclose, the alleged rotary shifter

system defect), the 'when' (from the time the vehicles were first placed on

the market in 2012 to the present day), the 'where' (the various channels through which FCA sold the class vehicles, including the dealership in Carlsbad, California, where Beck purchased his vehicle), and the 'how' (if Beck and the class members had known of the alleged defect, they would have not purchased or leased the class vehicles, or they would have paid less for them).") ; *Chapman v. GM LLC*, "the complaint alleges that (1) GM did not provide relevant and needed information about the trucks' compatibility with U.S. diesel or issues with the CP4 pump, (2) GM should have done so, as the manufacturer of the vehicles with superior knowledge about this pump, (3) this caused Plaintiffs to buy trucks that they otherwise would not have, and (4) they paid GM a premium that GM subsequently retained. . . . They have made sufficient 'who, what, when, where, how' allegations under Fed. R. Civ. P. 9(b) for an omissions-based claim at this stage[.]") ; *Matanky v. GM LLC*, 370 F. Supp. 3d 772, 790 ("Plaintiffs adequately pled the 'who' (GM), the 'what' (knowing about, yet failing to disclose, the alleged cooling system defect), the 'when' (beginning in 2014, when GM first marketed the Z06), the 'where' (vehicle information kits and brochures, owner manuals for the car, press kits, and GM-sponsored track

events), and the 'how' (if Plaintiffs knew about the alleged defect, they would have paid less for or not bought/leased their cars).").

The Court finds plaintiffs' fraudulent omission claims satisfy Rule 9(b)'s heightened pleading standard.

### 2. Knowledge

To sustain any fraud-based claim regarding an alleged omission, plaintiffs must plead facts showing the defendant manufacturer knew of the alleged defect before the sale of a vehicle. *See, e.g.*, *Smith v. Gen. Motors LLC*, 988 F.3d 873, 885-86 (6th Cir. 2021). Rule 9(b) allows knowledge to be alleged generally. *Persad*, 2018 WL 3428690, at *3; *Michaels Bldg. Co. v. Ameritrust Co.*, 848 F.2d 674, 680 (6th Cir. 1988) ("Especially in a case in which there has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control.")

Plaintiffs first allege FCA had pre-sale knowledge of the defect because its pre-release testing "should have" revealed it, and because there was "likely" a spike in warranty claims, repairs, and parts replacement involving the defect after the class vehicles were released. These allegations are too vague and speculative to support a reasonable

Page **21** of **42**

inference that FCA knew of the defect. *See Hall v. GM, LLC*, 2020 WL 1285636, at *3 (E.D. Mich. Mar. 18, 2020) (finding general allegations about defendants' pre-production testing and warranty/repair/parts data insufficient to establish pre-sale knowledge). Plaintiffs have not alleged any particular facts about FCA's pre-release testing or analysis nor any details regarding FCA's warranty, repair, and parts data that, if proven, would establish FCA's pre-sale knowledge. "Courts routinely reject generalized allegations about 'testing' and manufacturer 'analyses,' like those Plaintiffs lodge here, made in support of finding knowledge of a defect. *Id.* (internal quotations omitted) (citing *McKee*, 376 F. Supp. 3d at 761-62 (dismissing plaintiffs' fraud claims); *Beck v. FCA US LLC*, 273 F. Supp. 3d 735, (E.D. Mich. 2017) (dismissing fraud claim based upon failure to allege pre-suit knowledge of defect, collecting cases, and explaining that "[r]egarding the generic allegations of FCA's access to 'testing' and 'analysis,' courts have found substantially similar allegations to be insufficient to support an inference that a defendant knew about a design defect at the product's time of sale"); *Grodzitsky v. Am. Honda Motor Co., Inc.*, 2013 WL 690822, at *6 (C.D. Cal. Feb. 19, 2013) (dismissing fraud claims and noting that "Plaintiffs' generalized assertion that unspecified 'pre-release testing data'

Page **22** of **42**

and 'aggregate data from Honda dealers' fails to suggest how this information could have informed Defendant of the alleged defect at the time of sale"). Simply put, plaintiffs' allegations about FCA's unspecified pre-release testing and analysis or warranty, repair, and replacement trends are not sufficient to support a plausible inference that FCA had pre-sale knowledge of the defect.

Next, plaintiffs attempt to establish FCA's knowledge by pointing to consumer reports received and published by the NHTSA regarding the defect. The complaint alleges that, beginning in 2008, when FCA launched the generation of vehicles at issue here, NHTSA complaints regarding this defect spiked dramatically—from one in the prior year to hundreds. ECF No. 10, PageID.312. The amended complaint details eighteen complaints concerning the defect filed between 2008 and 2019, before plaintiffs purchased their vehicles. ECF No. 10, PageID.306-24. Some of these complaints also indicate FCA was notified about the issue directly. *Id.* Plaintiffs submit a compilation of hundreds more complaints as an exhibit. ECF No. 10-2. FCA notes that some of these complaints do not relate or relate only indirectly to the defect, or post-date plaintiffs' purchase dates. ECF No. 26, PageID.1269. While this is true, many others pre-date the

Page **23** of **42**

purchase date and relate directly to the defect. ECF No. 10-2. And plaintiffs allege FCA monitors NHTSA complaints and would therefore have been aware of these complaints. ECF No. 10, PageID.313. This large number of complaints, including complaints directly to FCA, and the spike from one to several hundred complaints with the launch of the class vehicles, suggests that FCA was aware of the defect affecting this class of vehicles.

Further, plaintiffs allege the two TSBs FCA issued and the NHTSA investigation related to the defect are evidence of FCA's pre-sale knowledge. Plaintiffs purchased their vehicles between 2015 and 2018 (though the proposed class of vehicles includes both earlier and later model years). FCA issued the first TSB in August 2016 and the second in June 2020. ECF No. 10, PageID.325. While the second TSB was issued after plaintiffs purchased their vehicles, courts recognize that "the issuance of TSBs plausibly suggests that a defendant knew about a defect for some time preceding their promulgation, because it is reasonable to infer that such technical guidance would be prompted by an accretion of knowledge that would take some time to gather persuasive weight, and more time necessarily would be taken up by investigating likely causes of a problem and formulating a remedy." *Francis v. GM, LLC*, 504 F. Supp. 3d at 684-85

(finding TSB was evidence of knowledge even where some plaintiffs bought their cars before it was issued) (internal quotation and citation omitted). The Court therefore finds both relevant to determining what FCA knew and when.

Neither party provided the Court with the TSBs to review, but according to the complaint, the first instructed dealers who receive complaints that sliding doors will not open or close to "first inspect the door actuator module and latch for fretting and oxidation corrosion at connections." *Id.* If inspection revealed issues with the module, dealers were instructed to replace the module, and if it did not, dealers were instructed to replace the latch. *Id.* This suggests FCA had identified the defect in the door actuator modules and recognized that it could lead to the door jamming and other safety problems plaintiffs complain of here.

The second TSB instructed dealers to replace the door lock actuators on a subset of class vehicles. ECF No. 10, PageID.326. This further indicates FCA was aware of the defect in its door lock actuators and knew that it remained an issue in at least this subset of class vehicles during the period between the first and second TSBs, the period during which plaintiffs purchased their vehicles.

The NHTSA investigation was initiated in July 2021, after all plaintiffs purchased their vehicles, in response to 476 consumer complaints alleging defects on the sliding door of 2016 Dodge Caravans and Chrysler Town and Country vehicles, a subset of the class vehicles. ECF No. 10, PageID.327. The complaints involved the rear doors jamming and passengers having to exit or enter through front doors or windows, which NHTSA noted poses safety concerns in the event of an emergency or crash. *Id.* However, while the door lock actuator defect can cause door jams like the ones that prompted the NHTSA investigation, it is unclear from the complaint whether and precisely how the NHTSA investigation is related to the defect at issue, because door jams could also be caused by other defects. Further, it was launched several years after the last plaintiff purchased their vehicle. Unlike a TSB, whose issuance implies *FCA* had knowledge of the issue in advance of issuing it, an investigation by NHTSA implies that *NHTSA* had prior knowledge of the issue. The Court does not find the NHTSA investigation demonstrates FCA's knowledge.

Altogether, the Court finds the robust record of public complaints regarding the defect and complaints made directly to FCA, and two directly

related TSBs sufficient, at this stage, to support an inference that FCA knew of the defect.

FCA argues the defect-related, pre-purchase-date complaints are not numerous enough to have put it on notice of the defect. FCA relies on a case in which the Sixth Circuit found that the number of public consumer complaints, including 239 NHTSA complaints, was relatively small, merely a "a blip on [defendant's] reports-and-repairs radar", considering the millions of class vehicles in use, and therefore insufficient to support an inference that the defendant knew of the alleged defect. *Smith v. GM LLC*, 988 F.3d 873, 885 (6th Cir. 2021).

This case is distinguishable from *Smith* because plaintiffs do not rely on the consumer complaints alone, but also the TSBs, which clearly illustrate FCA was aware of the lock actuator defect and bolster the strength of their showing. No such TSBs were before the *Smith* court. Further, the *Smith* court was also influenced by the fact that only one of the consumer complaints offered as evidence of knowledge spoke directly to the safety defect alleged, namely, that an issue with the dashboard cracking could lead to the spontaneous deployment of airbags; the remainder spoke only generally to issues with the dashboard cracking.

Here, dozens and dozens of the complaints speak directly to the door lock actuator defect and its consequences.

Though plaintiffs' allegations regarding prerelease testing, warranty date, and the NHTSA investigation do not advance their argument, their other allegations—the NHTSA complaints, complaints to FCA, and two TSBs—when taken together, as required, are sufficient to raise an inference that FCA knew of the defect before plaintiffs purchased their vehicles. *See Francis*, 504 F. Supp. 3d at 683 (finding combination of NHTSA complaints, TSBs, and pre-production testing results sufficient to show knowledge and remarking "GM attempts to parse the allegations regarding the various sources of its alleged knowledge and consign each to immateriality, but that is not how pleadings are read by federal courts. The allegations are construed as a whole and read in a light most favorable to the plaintiffs, not piecemeal and in a vacuum as the defendant would take them.")

### 3. Plaintiffs establish FCA had a duty to disclose

FCA next argues plaintiffs' fraud-based claims should be dismissed because plaintiffs fail to allege facts supporting that FCA had a duty to

disclose the defect, an essential element of each fraud-based state law claim. ECF No. 26, PageID.1271.

Pennsylvania law recognizes a duty to disclose based on superior knowledge for known serious and life-threatening latent defects. *Matanky*, 370 F. Supp 3d at 796 (citing *Zwiercan v. Gen. Motors Corp.*, 2003 WL 1848571, at *2 (Pa. Com. Pl. Mar. 18, 2003)). Plaintiffs plead FCA had superior knowledge of the latent defect. ECF No. 10, PageID.311-12, 339. Plaintiffs also plead facts establishing this defect could be life threatening, alleging doors could freeze open or shut, trapping passengers in the case of an emergency or accident, and could open while the vehicle was in motion, including by children. ECF No. 10, PageID.305-301. Plaintiffs establish a duty to disclose under Pennsylvania law.

"A duty to disclose may arise under Virginia law 'if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist.' *Matanky*, 370 F. Supp 3d at 796 (quoting *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999)). Here, plaintiffs allege (1) FCA had superior knowledge of the defect and intentionally concealed it, and (2) if they knew of the defect, they would have either paid less for the car or not purchased it at

all, making the existence of the defect a material fact. Thus, plaintiffs adequately plead that FCA had a duty to disclose under Virginia law. *See id.*

Under Florida law, "[p]ossession of superior knowledge alone does not create a duty to disclose"; rather, plaintiff must establish a fiduciary relationship. *DJ Lincoln Enters. v. Google, LLC*, 2021 U.S. Dist. LEXIS 135649, at *9-10 (S.D. Fla. July 21, 2021) (citing *Cordell Consultant, Inc. Money Purchase Plan & Tr. v. Abbott*, 2012 WL 13148744, at *3 (S.D. Fla. July 11, 2012)). Plaintiffs allege no facts establishing such a relationship here. Plaintiffs also argue Florida law recognizes a duty to disclose based on the existence of a safety defect. ECF No. 33, PageID.1487. However, the two cases to which they cite do not support this argument. In both, the courts found that other states recognized this duty, but not did not discuss Florida law. *Francis*, 504 F. Supp. 3d at 686; *Milisits*, 2021 WL 3145704, at *11.

Florida law does, however, impose "a duty to disclose on a defendant if that 'defendant's failure to speak would render the defendant's own prior speech misleading or deceptive.'" *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 5848843, at *6 (S.D. Fla. Sept. 21, 2016) (quoting *S.E.C. v. City*

Page **30** of **42**

*of Miami, Fla.,* 988 F. Supp. 2d 1343, 1356 (S.D. Fla. 2013)). Plaintiffs

argue FCA represented, through advertisements available to all class

members, that the Class Vehicles were reliable and safe family vehicles,

and that these representations by FCA were rendered misleading or

deceptive by FCA's subsequent failure to disclose the defect. ECF No. 10,

PageID.389. The Court agrees. *See In re Takata Airbag Prod. Liab. Litig.*,

2016 WL 5848843, at *6 (Plaintiffs sufficiently alleged a duty to disclose

under Florida law where plaintiffs pleaded Toyota made incomplete

representations about the safety and reliability of the Class Vehicles'

airbags while purposefully withholding material facts from plaintiffs that

contradicted these representations; the representation in question was a

statement on Toyota's website reading "With safety features like dual front

air bags, crumple zones and 3-point seatbelts in every seating positions.

So gather up all the hikers big and small and head out. Way out.").

Accordingly, plaintiffs establish a duty to disclose under Florida law.

Hawaii recognizes a duty to disclose "where disclosure of the fact is

necessary to prevent some previous assertion from being a

misrepresentation or from being fraudulent or material[.]" *WIHC LLC v.*

*NextGen Lab'ys, Inc.*, 2020 WL 5032055, at *8 (D. Haw. July 30, 2020),

report and recommendation adopted, 2020 WL 5031993 (D. Haw. Aug. 25, 2020). Maine recognizes a similar duty. *Sanford v. Nat'l Ass'n for The Self-Employed, Inc.*, 640 F. Supp. 2d 82, 87-88 (D. Me. 2009) ("It is a well-established principle of tort law that one who voluntarily elects to make a partial disclosure is deemed to have assumed the duty to tell the whole truth, i.e., to make full disclosure even though the speaker was under no duty to make the partial disclosure in the first place.... The comments to section 551 [of the Restatement (Second) of Torts] recognize that there is a distinction between remaining silent and saying nothing about a defect, which is not actionable unless a special duty exists, and disclosing half truths or misleading[,] ambiguous statements which another may rely upon to his detriment."). As discussed above with respect to Florida law, FCA's representations regarding Class Vehicles' safety are rendered misrepresentative by FCA's failure to disclose the defect. Accordingly, plaintiffs establish a duty to disclose in Hawaii and Maine.

Altogether, plaintiffs establish FCA had a duty to disclose the defect under each state's law.

### 4. Economic loss doctrine

The economic loss doctrine, which varies between states, generally prohibits "plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Earl v. NVR, Inc*., 990 F.3d 310, 314 (3rd Cir. 2021). FCA argues the economic loss doctrine bars plaintiffs' fraudulent concealment claims under state law in Florida, Virginia, Pennsylvania, and Maine law. ECF No. 26, PageID.1271.

However, in *Earl v. NVR, Inc.*, the Third circuit expressly held Pennsylvania's economic loss doctrine does not bar claims brought under the UTPCPL. 990 F.3d 310, 314 (3rd Cir. 2021). The Pennsylvania claims are not barred by this doctrine.

In Virginia (as in most states), the doctrine bars claims only when they sound purely in contract, or in other words, when the defendant's duty arises solely from a contract. *Capital One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d 374, 397-98 (E.D. Va. 2020); Here, plaintiffs' relevant claims stem from the statutory duties imposed by Virginia's consumer protection statute and common law of torts, not a breach of contract. Accordingly, the Virginia claims are not barred by this doctrine. *See Abi-Najm v. Concord Condominium, LLC*, 280 Va. 350 (2010) (VCPA

and fraudulent inducement claims not barred by the economic loss doctrine).

Under Florida law, plaintiffs' fraudulent claims fall under the fraud exception to the state's economic loss doctrine. *See Weidman v. Ford Motor Co.*, 2019 U.S. Dist. LEXIS 114017, *18-19 (E.D. Mich. July 10, 2019) ("In *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos., Inc.*, 110 So.3d 399, 406-07 (Fla. 2013), the Supreme Court of Florida addressed the need to limit the "over-expansion of the economic loss rule," expressly holding that the economic loss rule does not apply to claims based on fraudulent inducement or negligent misrepresentation. *Id.* at 406. With respect to fraudulent inducement, the court cited to its previous opinion in *HTP, Ltd. v. Lineas Aeras Costarricenses, S.A.*, 685 So. 2d 1238, 1239 (Fla. 1996), in which it held that "fraud in the inducement is an independent tort and is not barred by the economic loss rule." *Id.* Following *Tiara*, federal courts have refused to apply the economic loss doctrine to bar fraudulent concealment claims under Florida law. *See MyFord Touch*, 46 F. Supp. 3d at 965; *In re Volkswagon Timing Chain Prod. Liab. Litig.*, No. 16-2765, 2017 U.S. Dist. LEXIS 70299, 2017 WL 1902160, at *18 (D.N.J. May 8, 2017). Here, Plaintiffs' fraudulent omission claim falls within the

Page **34** of **42**

fraudulent inducement exception recognized in *Tiara* and *MyFord Touch*,
as these claims stem from Ford's intent to induce the Florida Plaintiffs into
purchasing their F-150s by concealing the Brake System Defect. *See Tiara*,
110 So. 3d at 406; *MyFord Touch*, 46 F. Supp. 3d at 965."); Lalli v. FCA
US, LLC, 446 F. Supp. 3d 218, 225 ("Florida's intermediate appellate
courts have applied that holding to conclude that the economic loss rule will
not bar claims of fraudulent inducement such as are asserted here, where
the defendant allegedly concealed facts to encourage a plaintiff to buy its
product.") (citing *Prewitt Enterprises, LLC v. Tommy Constantine Racing,
LLC*, 185 So. 3d 566 (Dist. Ct. App. 2016)). Plaintiffs' fraudulent
concealment claims under Florida law are not barred.

Maine's economic loss doctrine likewise excepts fraud claims. "It is
generally accepted that the economic loss doctrine does not extend to
claims of fraud where the alleged misrepresentation is independent of the
contract, such as claims for fraud in the inducement." *Am. Aerial Servs.,
Inc. v. Terex USA*, LLC, 39 F. Supp. 3d 95, 111 (D. Me. 2014). The fraud
exception applies in product cases like this one, so long as the fraud does
not relate "to the quality or quantity of the goods promised in the contract."
*Id.* Here, plaintiffs' fraud claims relate to omissions preceding the sale of

Page **35** of **42**

the vehicle and execution of any contract, not promises contained in a

contract. Plaintiffs' fraudulent concealment claims under Maine law are not

barred by the economic loss doctrine.

### 5.  Extraterritorial application of the FDUTPA

Plaintiff Mayor brings fraud claims under the Florida Unfair and

Deceptive Trade Practices Act (FDUTPA), Fla. Stat. § 501.201 *et seq.*, on

behalf of herself and the Florida subclass. ECF No. 10, PageID.348. FCA

argues the Court should dismiss Mayor's FDUTPA claim because she

purchased her vehicle in Virginia rather than Florida, so the FDUTPA does

not apply. The Court agrees. Plaintiffs argue the Court should read the

FDUTPA broadly and allow Mayor's claim to proceed, citing two cases

where Florida courts read FDUTPA broadly and allowed non-Florida

residents to pursue claims under FDUTPA. ECF No. 33, PageID.1490

(citing *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, 2012 WL 1570057,

at *5 (S.D. Fla. May 2, 2012); *Karhu v. Vital Pharms., Inc.*, 2013 WL

4047016, at *10 (S.D. Fla. Aug. 9, 2013)).  However, both authorities they

cite in support of their argument involved cases where defendants' errant

conduct occurred within Florida, a fact central to the courts' reasoning in

both cases. The conduct at issue here occurred in Virginia. These cases

are thus inapplicable here and, having no authority to support the argument that a party can use FDUTPA to challenge conduct that occurred wholly outside the state, the Court dismisses plaintiffs' FDUTPA claim on behalf of Mayor and the proposed Florida subclass.[2]

### 6. The Court does not yet determine whether the VCPA bars this class action

Plaintiff Zadrozny brings fraud claims under the Virginia Consumer Protection Act (VCPA), Va. Code Ann. § 59.1-196 *et seq.*, on behalf of himself and the Virginia subclass. ECF No. 10, PageID.386. FCA argues the VCPA provides a private right of action only for plaintiffs acting in their own capacities but bars class action claims under the statute. ECF No. 26, PageID.1273. Plaintiffs argue Federal Rule of Civil Procedure 23, which governs class actions, displaces the state rule. ECF No. 33, PageID.1491. This is a complex class certification issue, one on which courts in this and other districts have reached conflicting conclusions. *Compare Milisits*, 2021 WL 3145704, at *12 ("This Court joins the other federal district courts that have answered that question 'no' and that have allowed plaintiffs to pursue

---

[2] Plaintiffs also indicate they intend to seek the Court's leave to amend their complaint and allege claims under Virginia law instead of Florida law but have yet to do so. ECF No. 33, PageID.1490.

class claims under the VCPA.") *with Ford Motor Co. F-150 and Ranger Truck Fuel Economy*, 2022 WL 551221, at *19 (E.D. Mich. 2022) ("Several district courts within the Sixth Circuit . . . have rejected Plaintiffs' argument and enforced the statutory bars."). Further, no motion for class certification has been filed yet. The Court declines to address this complex issue until the class certification stage, when it will have the benefit of more developed briefing.

**D.   Unjust Enrichment claims**

Plaintiffs Mayor and Enright assert claims under Florida and Hawaii law, respectively, for unjust enrichment. FCA argues these claims should be dismissed for four reasons.

First, FCA argues plaintiffs fail to adequately plead unjust enrichment. ECF No. 26, PageID.1273. A plaintiff claiming unjust enrichment must plead that "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant accepted the benefit; and (3) injustice would occur if the defendant did not pay the plaintiff for the value of the benefit." *Chapman*, 531 F. Supp. 3d at 1304. Here, plaintiffs allege that "FCA appreciated, accepted, and retained the non-gratuitous benefits conferred by Plaintiff and the Class, who without knowledge of the safety defects paid a higher

price for vehicles which actually had lower values," and "[i]t would be inequitable and unjust for FCA to retain these wrongfully obtained profits." ECF No. 10, PageID.357, 368. This meets the pleading requirements.

Second, FCA argues an unjust enrichment claim is not viable where an express warranty exists. ECF No. 26, PageID.1273. "[A] vehicle purchaser cannot maintain an unjust enrichment claim where there is an express warranty that governs the same subject matter as his unjust enrichment claims." *Cunningham v. Ford Motor Co.*, 2022 WL 17069563, at *9 (E.D. Mich. Nov. 17, 2022).

Plaintiffs argue they should be allowed to bring the unjust enrichment claims as an alternative theory to their breach of contract claims regarding the warranty. Courts generally allow this alternative approach where the parties dispute or may dispute the existence of the warranty. *See Solo v. UPS Co.*, 819 F.3d 788, 796 (6th Cir. 2016) (noting "Rule 8(a)(3) permits pleadings in the alternative when, for instance, there is a dispute between the parties as to whether an express agreement exists" and declining to dismiss unjust enrichment claims where the issue of whether defendants would deny the existence of a contract remained live) (internal quotation and citations omitted). Florida and Hawaii law both allow this approach.

Page **39** of **42**

*See Lalli v. FCA US, LLC*, 446 F. Supp. 3d 218, 228-29 (E.D. Mich. 2020)

("Florida courts have permitted alternative pleading of warranty and unjust

enrichment claims particularly where there is a dispute over whether the

warranty covers the defect alleged. *Tershakovec v. Ford Motor Co.*, 96

UCC Rep. Serv. 2d 273, 2018 WL 3405245, at *14 (S.D. Fla. July 12,

2018) ('Ford's primary argument . . . is that the express warranty does not

apply in this case. To boot, Plaintiffs allege that the "contract remedy is

insufficient to make Plaintiffs . . . whole." Thus, at this stage, Plaintiffs may

maintain an unjust enrichment claim in the alternative to their breach of

express warranty claim.'); *Martorella v. Deutsche Bank Nat. Tr. Co.*, 931 F.

Supp. 2d 1218, 1227 (S.D. Fla. 2013) ('"[A]n unjust enrichment claim can . .

. be pled in the alternative if one or more parties contest the existence of an

express contract governing the subject of the dispute.'" (quoting *In re*

*Managed Care Litig.*, 185 F. Supp. 2d 1310, 1337-38 (S.D. Fla. Mar. 25,

2002))."); *Marisco, Ltd. v. GL Eng'g & Constr. Pte., Ltd.*, 2020 WL 3492572,

at *8-9 (D. Haw. June 26, 2020) ("However, at the pleading stage, a plaintiff

is generally entitled to pursue alternative theories. *See Maeda v. Pinnacle*

*Foods Inc.*, 390 F. Supp. 3d 1231, 1258 (D. Haw. 2019) ('The general rule

is that there cannot be an express contract and an implied contract for the

same thing at the same time. However, under the modern rule, a plaintiff generally is not precluded from pleading both the existence of a contract and unjust-enrichment theories. These theories should be pleaded in the alternative, because the fact finder may find that no contract exists and may still award damages on the theory of unjust enrichment.'").

Here, FCA disputes whether the express warranty covers the defect, rendering it appropriate for plaintiffs to plead unjust enrichment in the alternative under Florida and Hawaii law.

Third, FCA argues the unjust enrichment claims should be dismissed because plaintiffs have an adequate remedy at law. ECF No. 26, PageID.1274. This is essentially a reformulation of their second argument. While it is generally true that unjust enrichment claims cannot lie where parties possess an adequate remedy at law, FCA disputes that the express warranty covers this defect, which would vitiate any remedy available to plaintiffs under contract law. This argument fails.

Fourth and finally, FCA argues the unjust warranty claims should be dismissed because they are predicated on the same alleged conduct as the warranty claims and therefore duplicative. ECF No. 26, PageID.1274.

Page **41** of **42**

Again, because the claims are plead in the alternative, they are not duplicative and may move forward.

## IV.    Conclusion

For the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss (ECF No. 26):

All plaintiffs' express warranty claims and any MMWA claim premised upon them are **DISMISSED**.

The implied warranty claims by Mayor, Dobransky, Zadrozny, and Eisenhart and any MMWA claim premised upon them are **DISMISSED**.

Plaintiff Mayor's FDUTPA claim on behalf of herself and the proposed Florida subclass is **DISMISSED.**

The motion is denied in all other respects.

**IT IS SO ORDERED**.

<u>s/Shalina D. Kumar</u>
SHALINA D. KUMAR
Dated: March 31, 2023                United States District Judge